IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE THE SEARCH OF:                                 ) | Misc. Case No: |
| Eight (8) CELLULAR TELEPHONES                        ) | |
| DESCRIBED AS MOTOROLA MODEL #i860                    ) | |
| S/N 364VEQFQPF,NEXTEL PHONE, VERIZON LG              ) | |
| MODEL VX3200, MOTOROLA BOOST MOBILE                  ) | |
| MODEL H81XAH6RR1AN, SANYO SPRINT MODEL)              | |
| PM 8200(L), MOTOROLA MODEL i450,                     ) | |
| MOTOROLA MODEL H81XAH6RR4AN                          ) | |
| S/N 364KEY19KJ, MOTOROLA i830 MODEL                  ) | |
| H74XAH6RR4AN IMEI:000101719297390,                   ) | |
| MOTOROLA i415 S/N364VFQ55F5                          ) | |

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
SEARCH WARRANT

I, Kellie R. O'Brien (hereinafter Affiant), Special Agent, Federal Bureau of Investigation (FBI), being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed since May, 1999.  I am currently assigned to the Washington Metropolitan Field Office, Safe Streets Gang Homicide Unit.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am currently the co-case agent investigating a long-term gang related enterprise within the District of Columbia which to date has indicted nine individuals on  federal charges.  I have been the administrative agent on two T-III  wiretaps. .  Prior to these investigations I attended a sixteen week academy for the FBI which included training in arrests, search and seizures, consensual recorded conversations, and closed captioned television (CCTV) among

other things.

3.  I have received instruction and training and have participated in more than one hundred investigations involving: unlawful importation, possession with intent to distribute and distribution of controlled substances; the illegal structuring of financial transactions, the engaging in financial transactions to promote, disguise or conceal illegal drug trafficking and the source of the proceeds derived from it and unlawfully engaging in monetary transactions involving the proceeds of specified unlawful activity, practices commonly referred to collectively as "money laundering"; and conspiracies associated with the foregoing criminal offenses which are prohibited by Title 21, U.S.C. 841(a)(1), 843(b) and 846 and 18 U.S.C. §§ 1956, 1957. In the course of conducting or participating in these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover drug operations in which drugs are purchased from persons through the use of undercover police officers and undercover agents or cooperating witnesses; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; and preparing and executing search warrants and arrest warrants which have led to seizures of narcotics, firearms, and other contraband. In addition, I have participated in the arrests of more than one hundred (100) persons that were charged with drug-related offenses.

4.  In your affiant's training and experience, it is common for narcotic traffickers in Washington, D.C., to keep narcotics, narcotics related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or storage facilities, such as garages, sheds, storage lockers. In addition, they package crack cocaine for sale in varying

quantities. Ziploc baggies, small and large, are the packaging material of choice. It is further common for distributions to emanate from a specific location, such as an apartment. This distribution point provides security for the drug trafficker, and it is a known location to which customers go to obtain drugs. Further, your affiant knows from training and experience, that drug traffickers often use and retain firearms, and other weapons, to protect themselves and to secure their narcotics. Additionally, narcotic traffickers keep records of their trafficking activities to ensure that they receive payment for the narcotics their customers purchase. These records may be in written or electronic form. It is also common for narcotic traffickers to utilize cellular telephones to facilitate communications, while concealing their true location, between themselves, their suppliers and their customers. In your affiant's training and experience it is common for narcotic traffickers to utilize these telephones because of their mobility, their relative security, and their belief that law enforcement has more difficulty intercepting the telephone calls. Narcotics traffickers often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, telephone numbers, address books, photographs, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances. Also, I am aware that these items are generally maintained and retained in the drug dealer's residence, or the home of a relative or associate where the drug dealer can obtain quick access to them. Furthermore, it is a common practice for drug dealers to secrete proceeds of drug sales and other contraband in secure locations within their residence or residences of confidants. It is also a common practice for drug dealers to utilize safes within their residence, or that of a confidant, to safeguard and conceal the above described items. It is also your affiant's experience that individuals who are in possession of firearms also store in their homes ammunition, shell

casings, slugs, targets, gun cleaning kits and ownership papers.

5.  I have previously participated in investigations which led to the arrest and conviction of narcotics dealers. I received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband. Further your affiant knows from training and experience that drug traffickers often use and retain firearms, and other weapons, to protect themselves and to secure their narcotics.

6.  In conducting their illegal business, drug traffickers often use distinctive methods, language, and terms which to disguise conversations about their drug activities. Drug traffickers also frequently use electronic paging devices, commonly referred to as "pagers" or "beepers," to further their illegal activities. Such devices allow persons to communicate electronically with the assistance of a touch tone telephone. Each pager is assigned a telephone number and other unique attributes. A person calling a pager number from a touch tone telephone can communicate with

the person possessing the pager by entering a series of numbers at the sound of an electronically transmitted signal, which is typically one or more "beeping" sounds. The numbers which the caller enters are then electronically transmitted to the person in possession of the pager. The numbers appear on the digital display of the pager. Callers typically enter a telephone number at the sound of the beep, thereby signaling the person in possession of the pager to telephone the number. Drug traffickers also frequently transmit pre-arranged numerical codes to the pager at the sound of the beep to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the pager. Upon receiving a page, the person in possession of the pager typically either telephones the designated phone number or returns a message to the original caller by calling that person's pager. Accordingly, criminally-related telephone conversations frequently occur over telephone lines identified by the paging individual, shortly after a page is sent. Drug traffickers use pagers to further their illegal activities by identifying telephones, including cellular phones and public or pay phones, over which they can have a criminally-related conversation. The use of pagers in this way significantly limits the possibility that the resulting criminally-related telephone conversation will be intercepted by law enforcement authorities. Pagers also enable co-conspirators to remain in constant or ready communication with one another without restricting either party to a particular telephone or location with which they might be subject of physical surveillance by law enforcement authorities.

      7.     Individuals involved in narcotics trafficking keep records of their narcotics trafficking within their electronic storage devices. These may include records relating to currency, financial instruments, and other things of value and/or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from narcotics

trafficking. It is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, pagers, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to IPODs, MP3 players, and external storage drives and the media to store information, including diskettes, tapes, or data storage devices.

      8.      Your affiant asserts there is probable cause that contained within the memory, storage, recording devices, address books, contacts list, numbers of recent calls and other electronic storage media or programs of **eight (8) MOTOROLA MODEL #i860 S/N 364VEQFQPF, VERIZON LG MODEL VX3200, MOTOROLA BOOST MOBILE MODEL H81XAH6RR1AN, SANYO SPRINT MODEL PM 8200(L), MOTOROLA MODEL i450 S/N 364KFQ6G9C, MOTOROLA MODEL H81XAH6RR4AN S/N 364KEY19KJ, MOTOROLA i415 S/M 364VFQ55F5, MOTOROLA i830 MODEL H74XAH6RR4AN IMEI:000101719297390 ,** is evidence and instrumentalities of the crimes of conspiracy to distribute and possess with the intent to distribute, and distribution and possession with the intent to distribute Cocaine and Cocaine based. Based upon that probable cause, your affiant seeks the issuance of search warrants for these cellular telephones. Additionally, your affiant believes there is probable cause for any electronic storage device to include the above listed found in the aforementioned electronic storage devices contain evidence of the aforementioned crimes and seeks the court to additionally issue a search warrant for such electronic storage devices in order to promptly retrieve and analyze all electronically stored data, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, requires both on-site and laboratory analysis (if needed) by

a qualified computer or electronics specialist.

9. Based upon your Affiant's personal experience and consultation with other law enforcement officers:

    a. Computer hardware, software, documentation, passwords, mobile phones, communication, and other data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of criminal activities, and/or (2) the objects may have been used to collect and store information about criminal activities (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of criminal activities; or (2) storage devices for information about criminal activities;

    b. Components of a personal computer normally include the Central Processing Unit (CPU), a monitor which is commonly referred to as a "screen," a keyboard and any storage devices, i.e., hard disk drive, or magnetic tape drive. Further, your Affiant knows that a computer may include a device known as a modem which enables the computer to communicate with other computers equipped with a modem via telephone coaxial cable or other signal transmission lines. Your Affiant knows that some modems may be described as a small external component with lights on the front and a telephone line running from this item to a module in the wall. Your Affiant knows that modems may also be installed inside of a computer. Your Affiant knows that a modem is capable of sending and receiving electromagnetic signals generated by a computer across telephone lines to another modem and then to another computer to which a second modem is attached, thus communicating data from the sending computer to the receiving computer or vice versa;

    c. It is common for a user of such an electronic storage device, such as a computer or a cellular phone to situate peripherals, software, instructions, records, backed up data files and the like in the immediate area of a computer or electronic storage system or in the device's remote storage areas;

    d. Hardware and software may be utilized to store records which include, but are not limited to, those relating to business activities, criminal activities, associate names and addresses, and the identity and location of assets

        illegally gained through criminal activity. These records may be more fully described as information or data stored in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard disks, removable hard disk cartridges, hand-held computers or other devices known as personal digital assistants ("PDAs"), zip drives, laser disks, magnetic tapes, CD-ROM, DVD media, floppy diskettes, and other related media, including those capable of storing magnetic coding;

    e.    Computer hardware may be described as any and all electronic devices capable of creating, converting, displaying, transmitting or analyzing magnetic or electronic impulses or data. These devices include, but are not limited to computers, cellular phones, peripherals, such as printers, modems, plotters, circuit boards, and other electronic devices;

    f.    Computer software may be described as any and all programs or instructions capable of interpretation by a computer and related devices which are stored in the form of magnetic or electronic media. These items include, but are not limited to, application software, operating systems, programs, compilers, interpreters, and other programming utilized to communicate with computer components;

    g.    Computer instructions may be described as existing in the form of books, manuals, notes and the like, which include, but are not limited to, written or printed material which provides exemplars and instructions regarding the operation of computers, peripherals, and software;

    h.    To completely and accurately retrieve data maintained in computer hardware or on computer software, insure accuracy and completeness of such data, and prevent the loss of the data either from accidental or programmed destruction, it is necessary that all computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting.

    10.    Each computer or electronic storage file is the equivalent of a hard copy file, but possibly contains many pages of information. By analogy to hard copy data, agents of the FBI will have to examine at least the first "page" of each such file in order to determine the contents of the file, and whether the file is properly seizable under the warrant. In order to conduct this initial

examination, your Affiant proposes that the computer or mobile phone with its storage devices and their internal hard-drive or other electronic data storage, and related equipment be removed to the safekeeping of the FBI to permit examination of the contents of the hard-drive files to separate for thorough review only the magnetically stored documents within the scope of the warrant. The records in the hard-drive or internal data storage are inseparable, in the sense that no single record can be seized in its original form on the computer without seizing the hard-drive and the related equipment necessary to view the data.

11. If needed, an FBI Computer Investigative Specialist will also have to examine the system to determine whether any security devices have been installed to prevent copying of the records authorized to be seized or to cause their destruction within the system. The software programs used in connection with the data stored in the hard disk or on diskettes must also be examined by the FBI agents in order to determine that they are in fact standard, commercially-available software, so that the FBI may obtain identical programs, if necessary, for examining and copying the data files which contain records authorized to be seized.

## BACKGROUND OF THE INVESTIGATION

In October, 2004, the FBI obtained information that a large narcotics trafficking organization was operating in the greater Metropolitan Washington, D.C., area and elsewhere. This organization, which is headed by **ANTOINE JONES,** is responsible for the distribution of cocaine. Based on information obtained from confidential sources and corroborated by physical surveillance, analysis of telephone records and pen registers, and other investigative techniques, the FBI has learned that **ANTOINE JONES** is the main supplier of large quantities of cocaine, including kilogram quantities, for the drug trafficking organization. Investigation into **ANTOINE**

**JONES's** background revealed that he has an extensive history of trafficking in narcotics, particularly cocaine. **ANTOINE JONES** was arrested in 1993 and charged with Possession with Intent to Distribute 50 Grams or More of Cocaine Base, and Using and Carrying a Firearm During a Drug Trafficking Offense, in connection with a cocaine distribution scheme that moved numerous kilograms of cocaine through the Washington, D.C. area. In that case, **ANTOINE JONES** was released on personal recognizance pending trial. After having been indicted, and while still on release, **ANTOINE JONES** was arrested in possession of over 600 grams of cocaine, charges to which he eventually pled guilty. **ANTOINE JONES** now maintains a discreet operation, and limits his contacts to individuals known to him personally, or introduced to him by trusted, well known associates. When he does engage in drug transactions, he does so almost exclusively with the assistance of his right-hand associate, **LAWRENCE MAYNARD,** one of the few people with whom he will deal directly.

    **ANTOINE JONES** is the sole proprietor of a nightclub named "**LEVELS**," which is located at 1960 Montana Avenue, N.E., Washington, D.C. Investigators believe that **ANTOINE JONES** uses his business as a location where he can conduct his drug trafficking activities, as well as launder drug trafficking proceeds. **MAYNARD** is listed as the "A.B.C. manager" of the nightclub in the records on file with the District of Columbia Alcoholic Beverage Regulatory Agency (ABRA).

    According to information provided by confidential sources, and confirmed through various law enforcement means, **MAYNARD** undertakes many tasks on behalf of **ANTOINE JONES's** narcotics trafficking organization, including but not limited to being an intermediary and a point o believe is a monthly basis, **MAYNARD** drives a vehicle that is usually supplied by **ANTOINE**

**JONES** to unknown locations outside of the District of Columbia where he meets with an unknown supplier(s), exchanges large quantities of U.S. currency for kilogram quantities cocaine, and then transports the cocaine back to the greater Washington D.C. area for redistribution.

During the course of this investigation, a number of confidential sources, who are cooperating with law enforcement, provided details regarding **ANTOINE JONES'** large-scale narcotics trafficking organization. The information provided by these confidential sources has been corroborated by independent investigation, including but not limited to surveillance, search warrants, debriefings of additional confidential sources and witnesses, a review of available subscriber information and pen-register f contact between **ANTOINE JONES** and his drug suppliers and customers. On what investigators data, and a review of stored text-messages on the cellular telephones of **MAYNARD** and **ANTOINE JONES**, obtained via search warrant.

Further, in the course of the investigation leading up to the initial affidavit in support of the wire tap, pen register data revealed that towards the end of every month, **JONES** spoke with an individual on a cellular telephone number with a (713) area code, which was subscribed to in the name of Juan Lopez,[1] in McAllen, Texas, a major point of entry of narcotics into the United States. True to form, on September 20, 2005, **JONES** received two telephone calls from (713) 386-9548,[2] at 10:45 a.m., and again at 10:47 a.m. (the first call was apparently cut dropped mid-

---

[1] Investigators believe that "Juan Lopez" is a fictious name. However, your affiant will refer to the user of this telephone as "UM-1" for ease of reference.

[2] While this is a different number than showed up on the pen register on **JONES'** phone in previous months, UM-1 actually tells **JONES** in the course of this conversation that this is his new number, to which **JONES** replies that he will "lock it in." Further, both (713) telephone numbers come back to "Juan Lopez."

conversation), totaling 3 minutes and 46 seconds. This is the first time that **JONES** has spoken with UM-1 during the course of the interception period. During the call, UM-1 told **JONES** that he had been trying to find "some new music", but that it is getting a little rough on his side. He assures **JONES**, however, that he has some "good people" who make some "good music," and that he is just waiting for them. UM-1 then asks **JONES** whether he likes the music that UM-1 sent, to which **JONES** replies that "they love the sound, they love the entertainers, they love it." **JONES** asks UM-1 whether they will take "a couple weeks," to which UM-1 responds that he still has a little bit of music there. **JONES** mentions that "they like the whole studio, they like how they can practice back-to-back," and that everyone is happy on this side "as far as the band." UM-1 states that it will take "a couple weeks, right," and **JONES** states "they just go ahead and be ready." UM-1 replies that he just needs time to "put the music straight and everything together and that will work." Later in the conversation, UM-1 tells **JONES** that he was just trying to see if everything was cool and to inform **JONES** that everything looks good on his end, to which **JONES** responds that they just need it in a week or two, so it's cool. Also, twice in the conversation, **JONES** tells UM-1 that he is going to the "Studio" later that day. Investigators believe that in this conversation, **JONES** and UM-1 are discussing the quality of the most recent multiple-kilogram shipment of cocaine ("how do they like the music?" and "they love the music") and also discussing the timing of a forthcoming shipment ("everything looks good on this end" and "a week or two is cool").

Then, on Monday, September 26, 2005, at approximately 6:30 p.m., **JONES** called UM-1 at (713) 386-9548, and reported to UM-1 that he has been working around the clock to get things together so that the "studio" be ready. UM-1 replies "great" and says that a "friend" is going to

12

get everything together by Wednesday (believed to be September 28, 2005), and that they are going to pick up the "discs" of which they have nine remaining, and requests that **JONES** "give [him] a hand." At that point, **JONES** cuts him off, saying "we got you, we got you – we can't do it no quicker but we're trying," stating that they have "been going 24 hours a day" with "100 things going," but that they should be ready by Wednesday. Both men express a hope that, after Wednesday, everything will be in place so that they can "take a few days off." Investigators believe that in this conversation, **JONES** and UM-1, who supplies cocaine to him, are discussing the timing of the next big shipment of cocaine, and **JONES'** ability to collect money in advance from his customers to pay for this shipment. In the hour after this call, **JONES** attempted to contact or contacted **ADAMS, HOLLAND, JOHNSON,** and **CARTER**.

Further, with respect to **JONES'** supply chain, **JONES** has been making suspicious telephone calls with great frequency in recent days with telephone number (678) 330-7712, a Nextel cellular telephone, subscribed to in the name of John Yi, at an Atlanta, Georgia address.[3] Within the past week, we have obtained a pen register order for this telephone, complete with tracker and cell site information, which has revealed that the user of this telephone has made the majority of the phone calls to **JONES** while in the Oxon Hill, Maryland area. In these calls, all of which are initiated by **JONES**, **JONES** states simply "what's up" or "yeah" or "OK," to which UM-2 responds in kind. In a few of these calls, **JONES** says "20 minutes," or "5 minutes," or similar. On those occasions, the cellular site tracker on **JONES'** telephone has revealed that he is in the same cellular site in Maryland. Investigators believe that through these calls, **JONES** is

---

[3]   Investigators similarly believe that this is a fictitious name, and for ease of reference, will refer to the user of this telephone as "UM-2.".

signaling to UM-2 a time to meet at a pre-ordained location, or perhaps a quantity of cocaine he plans to purchase (e.g., "5 minutes" may mean that **JONES** is seeking five kilograms of cocaine). Investigators further believe that UM-2 may be the "friend" who is going to "hook everything up," to whom UM-1 referred in the September 26, 2005, telephone call with **JONES.** Finally, toll records pertaining to (678) 330-7712, have revealed that UM-2 utilizes the "direct connect" function on his telephone – which allows him to speak with another Nextel subscriber, if he specially identifies that number with Nextel, with the touch of one button. Of the few telephone numbers he has specifically identified, two of them are these (713) numbers subscribed to by Juan Lopez, UM-1. Thus, investigators believe that UM-1 and UM-2 are close associates of each other, and are likely members of the supply-chain leading to **JONES**.

Wire interceptions further reveal the role of Texas suppliers in **JONES'** organization. For example, on Monday, October 10, 2005, **JONES** spoke with an unknown Hispanic sounding male (UM-1) on (713) 386-9548, who indicated that it should be another 7-8 days before things are ready. Throughout the course of this period, **JONES** also has had more frequent contact with another Hispanic sounding male (UM-3)[4] at (909) 975-0957, which is a Nextel cellular telephone registered in the name of Mike Wills in Irvine, California, and believed to be a fictitious name, in which the pair seem to meet on numerous occasions at a location which investigators believe to be a stash house in Ft. Washington, Maryland. For example, on October 4, 2005, at 10:56 a.m., **JONES** called (909) 975-0957, and asked UM-3 what time he could get to "the spot." The

---

[4] For clarity, we are using the designation "UM-3" in this affidavit to refer to the user of (909) 975-0957, because UM-2 has referred in the September 30, 2005, extension affidavit to another Hispanic sounding male, also believed to be a member of **JONES'** Texas-based supply chain.

unknown male replied "15 or 20 minutes?" **JONES** said "OK" and hung up the phone. Then, at 11:19 a.m., UM-3 called **JONES** from (909) 975-0957, and stated that he was "already there." **JONES** replied that he would be there in 10 minutes. Based on the first call, a team of investigators quickly set up surveillance on a road near the suspected stash house in Ft. Washington, Maryland. Sure enough, a short time after the second call, **JONES** drove into the neighborhood in his Jeep Cherokee, and was observed and photographed driving out of the neighborhood a few moments later, in the company of a Hispanic male.

Similarly, on October 13, 2005, at 5:25 p.m., **JONES** called the (909) number. UM-3 who answered said that he would only be around until 8:00 p.m., and then he was going to meet the girls. **JONES** said he would swing by, either before then or the following morning. **JONES** also referenced "20 of the VIP tickets." **JONES** followed up on this call at 7:13 p.m, when he called the (909) number again and stated that he was 5-10 minutes away. Approximately 30 minutes later, in rapid succession over the course of 8 minutes, **JONES** called **KEVIN HOLLAND**, **DEMETRIUS JOHNSON**, **MIKE HUGGINS**, and **JOHN ADAMS**, each call lasting between 41 seconds and 1 minute and 35 seconds. For unknown reasons, the wire tap equipment transmitted no audio with respect to these calls (or several non-pertinent calls thereafter). Investigators nonetheless note the significance of this flurry of calls by **JONES** to the Usual Suspects, in the immediate aftermath of his meeting with the user of (909) 975-9057, a likely cocaine supplier, as **JONES** notifying his customers that another shipment was coming through.

On October 24, 2005, member of the Safe Streets Task Force executed a District Court Search warrant issued by the District of Maryland at 9508 Potomac Drive Fort Washington,

Maryland

Among the items FBI-MPD Safe Streets Task Force members recovered from 9508 Potomac Drive Fort Washington, Maryland

(1) 97 kilos of cocaine (street worth approximately $13,000,000.00);

(2) 3 kilos of crack cocaine (street worth approximately $300,000)

(2) $844,520 in assorted U.S. currency.

(3) money counter, heat sealer, heat seal plastic, pay-owe note books.

(4) Found on the person of Rolando Cerrillo-Montelongo **MOTOROLA MODEL #i860 S/N 364VEQFQPF, VERIZON LG MODEL VX3200, MOTOROLA BOOST MOBILE MODEL H81XAH6RR1AN ;**

(5) Found in room B (Living room) in the closet **SANYO SPRINT MODEL PM 8200(L)**

(6) Found in Room G (bed room) **MOTOROLA MODEL i450 S/N 364KFQ6G9C, MOTOROLA MODEL H81XAH6RR4AN S/N 364KEY19KJ;**

(7). Found on room H (bedroom) **MOTOROLA i415 S/M 364VFQ55F5, MOTOROLA i830 MODEL H74XAH6RR4AN IMEI:000101719297390**.

The following individual were arrested at 9508 Potomac Dr. Fort Washington, Maryland Rolando Carrillo-Montelongo DOB: 02/09/1982; Ricardo Sanchez-Gonzalez DOB 06/09/1962; and Roel Bremea, Jr. DOB 12/31/1969 and charged with CSAConspiracy to Distribute Cocaine (5 kilos or more)

.        Based on the listed facts your affiant submits that there is probable cause to believe that ROLANDO CARRILLO-MONTELONGO, RICARDO SANCHEZ-GONZALEZ, ROEL BREMEA, JR, and others were involved in the illegal use of communication facilities and the illegal distribution of narcotics in the southeast section of Washington, D.C., in violation of Title 21, U.S.C. Sections 841, 843 and 846.  Moreover, your affiant submits that there is probable cause to believe that secreted within the confines of **eight (8) MOTOROLA MODEL #i860 S/N 364VEQFQPF,  VERIZON LG MODEL VX3200, MOTOROLA BOOST MOBILE MODEL H81XAH6RR1AN, SANYO SPRINT MODEL PM 8200(L), MOTOROLA MODEL i450 S/N 364KFQ6G9C, MOTOROLA MODEL H81XAH6RR4AN  S/N 364KEY19KJ, MOTOROLA i415 S/M 364VFQ55F5, MOTOROLA i830 MODEL H74XAH6RR4AN IMEI:000101719297390**  is evidence and instrumentalities of the crimes of conspiracy to distribute and possess with the intent to distribute, and distribution and possession with the intent to distribute narcotics.

_____
**Kellie R. O'Brien**
**Special Agent, FBI**
**FBI-MPD Safe Streets Task Force**

**Subscribed and sworn to before me this  \_\_\_\_\_  day of October, 2004.**

_____
**UNITED STATES MAGISTRATE JUDGE**
**District of Columbia**